Good morning, Your Honor. My name is Bruce Bryan. May it please the Court, I represent Mohammed Rafiq Islam. I'm going to try and reserve three minutes for rebuttal. I begin with the questions posed, of course, by this Court in the recent order that it issued. The first question was, did defendants' opening briefs specifically argue that the government's duty to investigate the veracity of others' testimony was triggered during trial once it discovered that Tazazu lied or was the issue waived? We believe that the issue was sufficiently presented. What are you relying upon for that, please? Yes, Your Honor. Two things, that the language in the opening brief in Section 2 and to somewhat into Section 1. Section 2 was the Nipuhi issue. Section 1, in our brief, addressed the Bowie case and the pretrial investigation. Also, we rely on the government's . . . Those were unappealable, but at the trial court level, were they raised? We believe so, Your Honor. We filed, we objected to . . . This is kind of a difficult, intricate matter because of the interplay with the limitation on cross-examination that had to do with the attorney-client privilege of Ms. Brown representing the five. We were precluded initially from delving into that, which tied in directly to the availability and the understanding by the complaining witnesses of the TVCIS. So, we weren't able to get into that subject until the very end of the trial, and when we were able to get into that subject, it was extremely limited. So, we think that with our objection, our motion for a new trial and a motion for the mistrial, we covered that. We also covered it in the opening brief, and the government, we believe, was put on notice by that because they adequately . . . well, not adequately . . . they responded to it. Specifically, on the issues that we asked about? Arguably, Your Honor, no. I mean, it was not the model of clarity. I think we focused really on Paz-Azul's perjury. We kind of focused directly on that. We focused on the limitation of cross-examination. So, no, this wasn't . . . that particular issue as to what . . . did we address the issue as to the duty of the government to investigate during trial after Paz-Azul's lies? I think we addressed it, but I don't think we directly addressed it. Let's assume that the argument was preserved. I guess I still, though, have a question about materiality, given that the jury did hear from at least one of the victims. I don't know if that's what we're calling them. And, obviously, was in a position to realize that, boy, he lied because he admitted he lied. And then, once they heard from the lawyer, even the very limited cross-examination you were able to conduct, I think most jurors would have realized that, yes, these other four or three witnesses also must have lied about not knowing anything about the TV's because their own lawyer told them in pretty uncertain terms that, yes, of course, I advised them about that. So, the jury was, it seems to me, put on notice, so to speak, that at least that limited aspect of each of those witnesses' testimony was false and yet, nonetheless, obviously came out the way that it did. So, what's your argument for why not having basically the other witnesses come in and also admit that they lied, why does that have any likelihood of affecting the outcome? Yes, Your Honor. This was a case based on complete credibility of the five complaining witnesses. And in that aspect, it's analogous to Hayes v. Brown and not analogous to the Morris case. Hayes v. Brown was, the one witness was their entire case. And if I can just get to my notes real quick, Your Honor. Jackson v. Brown, Michels and McFarland were the only ones to change on that testimony. Same with Hayes v. Brown, where James was the key witness, the crucial witness in the government's case, and that's noted, Hayes at 986. Contrast that with the Morris v. Yist, which is, there was independent corroborating evidence, okay? And so, Hayes v. Brown and Jackson v. Brown, just like our case, five complaining witnesses that are crucial and key to government's witnesses. So, materiality, I think that's where the Ninth Circuit, in many of these cases, Hayes and Yist v. Morris say, when you introduce perjury into the trial, reversal is nearly automatic. We know that it's not per se automatic, but when you're dealing with witnesses that are crucial to the government's case, any bit of perjurous testimony admitted into trial is reversal. Now, our problem is, we didn't get an absolute admonition from the prosecutor to say, or an investigation to say, these other four complaining witnesses lied to you, jury. What's the importance of that? Because Ms. Brown took the stand and said, I told those witnesses, I told my clients about T-Visas. That's all we were allowed to ask. Now it becomes a balancing to the jury. Do I believe Ms. Brown, or do I believe the other complaining witnesses? But with respect, counsel, isn't that what you always deal with, with the jury? I mean, you all did a good job of saying, you know, these people lied, you know. One did, the others did. You did everything you could to try to get them to not believe any of it. Yes. Which is, of course, your right and your obligation. Yes. But, you know, some of the cases that you did, there was no really effective disclosure to the jury. In this case, you didn't have that, did you? I mean, the jury knew about the issue. The question was, did all of them lie? And based upon what was said, is not it clear that the jury could easily have assumed, and probably did assume, that every one of them lied, but it factored that into its decision and decided against your client. Isn't that enough in this case? Again, Your Honor, I don't think it is. I think there's a distinct difference between the prosecution standing up after an investigation, which surely would have told them that each one of these people lied, stood up and told the jury, these five complaining witnesses lied to you about these things. But didn't defense counsel make that point, though? We did. But also, on top of that, the prosecution brought Tassuzul to the stand, and when they said, okay, well, did you lie? It's like, yes. And then they gave him the opportunity to explain it away. That's not the duty of the prosecutor. The prosecutor, to stand up, clearly, as in the LePage case, the prosecutor needs to stand up and say, and stop, and say, that person lied. Period. They can't build upon and say, yeah, he lied, but maybe there's some reasonable explanation. And that ties into . . . On what case do you rely for that proposition? The LePage, Your Honor. The LePage . . . You have to say what you just said. Yes. Yeah. The LePage actually gave an example of what should happen when the prosecution is faced with that situation. And the LePage court said, normally, what should happen is the prosecutor should stand up after a bench trial with the . . . I'm sorry, a bench conference with the judge, and decide how this should occur. But it has to occur . . . Well, from the perspective of the prosecution, I gather they would say, well, yeah, this witness did so testify. Through your cross-examination, you made it clear that probably the others lied as well. So the jurors clearly had that before them. This isn't a structural error case, is it? No, Your Honor. And I agree. But the one problem that I keep having is . . . I agree with you. I argued it. I think other defense attorneys argue it. But it's simply argument. That's the problem. And we're always saying when we talk to the jury, it's always about, well, probably they knew it. Probably they didn't. But this is a fundamental pillar of our justice system. I truly believe that. And that is set forth in case after case after case that we cite. The landmark cases, Hayes v. Brown and Yist v. Morris. We cannot allow perjury or false evidence to infiltrate the truth-seeking process. Can I ask, did you make any effort after the trial court sort of revealed that, yes, each of these other witnesses also must have lied about the TV's of knowledge, did you make any effort to have the trial court sort of force the same kind of investigation and recalling of those witnesses? We had . . . if I recall, Your Honor, we had a colloquy between the judge and the prosecution. And I said, look, Your Honor, they have to get up and correct this record. They have to do that. And the prosecution said, no, we don't. You can do it. And that's been their reply and their position all the time. It's clear in their answering briefs. And you did it? No, we did not. And here's the reason why. Just to finish, and the judge said, you can cross-examine them, Mr. Berline. Meaning you could recall them and . . . That's right. That's right. And I'm like, but it's their duty, Your Honor. Here's the problem with us correcting the record. It's clear in the cases. It's not the defense's duty. It's the prosecution's duty. And the risk that I run, which I ran and suffered tremendously, is when we had to call to try and clear this up, to try and call the attorney, you can see in the transcripts that she's like, yes, I represent the victims of trafficking. And I can't do anything without appearing very rough to the jury to say, stop that. You're not answering my question. You're just . . . It was pretty unfair. For me to have to do that with every one of those witnesses, number one, there was no guarantee that they were going to just suddenly tell the truth. That's the problem. I think a very good point here is this case is in Saipan. My client was a foreign worker. These other five complaining workers were foreign workers. The only connection they had to this jurisdiction, really in this case, was the job was there. You could tell by the transcripts, by the way the testimony was going, and the way they did not want to admit that they knew about T visas, that they wanted to stay in the U.S. They came here and clearly lied to the U.S. Embassy to get here. And I don't blame them. They wanted to come to the U.S. and work. When they got here and they ran into trouble, they go to the U.S. Attorney and the government, and the government investigates it, gives them work visas, work authorization, ability to stay here, and the opportunity for T visas. Bowie has a good point. In U.S. v. Bowie, they talk about when the prosecutor uses criminals to just to prove their case, they have to be extra diligent. I'm not really calling these complaining witnesses criminals, but it's the same thing. They knew T visas was their pathway to citizenship. That's why this question was so important. That's just like to a criminal getting a super good plea agreement or not getting prosecuted. With respect, counsel, just like that, you can point that out in cross-examination. You can do all the things the judge said you could do to raise that point. You chose not to. You thought it was the prosecution's obligation, and that's really what it boils down to. The jury heard what it needed to. You wanted the prosecution to take some of the burden off of you. I get that. I understand that. But since this is not structural error, don't we just have to examine whether this affected the outcome of the trial? Yes, that's absolutely where there's a reasonable likelihood of the outcome being affected. It's entirely up to you, but you've only got 33 seconds. Well, I may as well just go for it. Thank you, Your Honor. The important point to your point is, and this is the interrelation of the cross-examination limitation because of the attorney-client privilege. We couldn't do that. We couldn't sufficiently flush out all those facts about you knew what a T visa was, your attorney told you about it, and your attorney told you that it's super important to cooperate with the prosecution. That's the stuff that we can't get out to show the jury that . . . I understand that. I really do. Do you have any other questions? Okay. Thank you very much. We appreciate your argument. We'll hear from the government. Good morning. Good morning. My name is Eric O'Malley. I'm with the government. May it please the Court. I want to first address Mr. Berline's contention that this was a case that was entirely dependent on the testimony of the victims. I submit that that is not at all the case. We introduced more than 60 exhibits. We had testimony from a cooperating defendant. Amongst those exhibits were recordings that the victims had made where the defendants gave incriminating statements in their own words. There were bank records that were obtained from banks in Bangladesh that corroborated the victims' stories. There were also the certificates that were submitted to USCIS that established that the defendant's client or the defendant basically duplicated false certificates on behalf of the victims. All of those I would submit we could have won that case with the testimony of a case agent and these exhibits. I would also like to address what I believe is a fundamental weakness in the defendant's argument, and that is that the knowledge of T visas would have provided an incentive for these victims to lie. I would submit that, on the contrary, these victims, had they known about T visas, would have been told that if they lie, they will not get a T visa. In fact, I think Tazis will probably learn this the hard way. It is the government's burden to produce enough evidence to establish guilt beyond reasonable doubt. It is not the government's burden to debunk every single conspiracy theory floated by the defendant, and that's what this was. Well, I guess I don't read the record that way at all, counsel. I mean, once the lawyer got up there and said that I advised each of my clients about the availability of a T visa, I think you weren't the trial lawyer, I take it? I was second chair, yeah. Okay. Well, you and your team then knew that, in all likelihood, these other four witnesses had lied just like the first person had. I guess I don't think of this as any kind of a pie-in-the-sky conspiracy theory. The lawyer admitted that I advised the clients about this. On the stand, each of them denied any knowledge of T visas. So where's the conspiracy on that front? Well, Your Honor, our investigation, and I believe that the victims did not lie. You say that you conducted an investigation as to each of the other four, just as you did for the one guy? Well, if I may be permitted to speak to matters off the record, we did. We called them in and we asked them, did you have any discussions with the attorney about T visas? And they all said that they do not recall having those discussions. We warned them that they were likely to be recalled. That's what we expected to happen. And we told them, we admonished them that, good, bad, or ugly, you need to tell the truth. My recollection, and again, this is all based in recollection, unfortunately, this is the tail end of a trial, in the middle of a hot trial, a lot of firing back and forth. Our agents did not make any reports. I scanned to see if there were any emails to counsel. There were not. But my recollection is that I informed, not Mr. Berline, but one of the other co-counsels, Mr. Torres, I believe. It's all based on recollection from two years ago. But that we informed them that we talked to the other witnesses, and our belief was that if they took the stand, that they would stick by their stories, that they don't recall that, and that Tazi Zul's explanation, that the conversation was with him, and that the others were not paying attention. I know that that's probably not going to be satisfactory to Mr. Berline, and his preference would be that we call the witnesses and apply the thrum screws, but we're not supposed to do that. So, based on our investigation, and the demeanor of the witnesses when they testified at trial, Judge Kuhnhauer was able to observe that. I think he agreed with our assessment that the innocent explanation was the most likely one, and therefore, based on that, the proper resolution, if the defense insisted that there was some line, then the proper, the easiest way to get to the bottom of it would have been to recall those witnesses, and I think Judge Kuhnhauer left the door open for that, and that would have been the best possible resolution. Why didn't you feel, and I understand what you're saying, that maybe you talked to these witnesses, and they seemed credible in their denial, but why didn't you feel that it was your obligation as the government to put the witnesses back on? And if they, in fact, offered the explanation that they did, then that's obviously to your benefit, but I guess I don't see how you can shift the burden to the defense to say, well, hey, the witnesses are all yours, go ahead and call them if you want. We'll tell you right now that they're probably not going to be helpful, but go for it if you want. I guess that does seem to be inconsistent with the obligation that the government has to ensure that no false testimony is put before the jury. Your Honor, I would make two points. First, at this point, the case was in the defendant's courts, we could have reopened the case, but they could have just as easily called those victims back to testify, and they would have, in those circumstances, had the first shot. Counsel was complaining about how we asked Tazi Zuhl about whether or not he lied, and then kind of asked for an explanation. Had they called them, they would have had the first attempt at questioning, and they could have, for lack of a better way of describing it, conducting our own investigation, because they would have been under oath. So I think that would have been the most satisfactory resolution. As to your point, why would it not be our responsibility, and I'll take this opportunity to distinguish this case from the Ilst case. I think that's how you pronounce it, I'm just guessing. But the Ilst case, you had a letter that was kept within the confines of the prosecution team. And this was a letter that indicated there was some possibility of perjury by one of the witnesses. And they kept that within the confines of the prosecution team, it was not revealed, it did not put the defendant on alert until 17 years later. In this case, the defendant was on alert from the very beginning, from almost before trial, I would say. In fact, that was a major theme of their argument throughout trial. And so, you know, this is not a situation where we suspect that our witnesses had lied, we need to find out, and if we find out, then we need to bring that to the court's attention, absolutely. But in this case, distinguishing this case, the defendant was well aware of it, they could have recalled those witnesses, that would have been the most effective way of cross-examining, or getting to the bottom of this, I should say, from the defense point of view. And frankly, that's what we were expecting. We had warned the victims that you can expect that you will be recalled and asked about this. This actually presents an interesting issue from the government's perspective as well, because your counterpart suggests you have a burden to bring them back out, but you've been told by them that they didn't have any recollection at all. So if you did that, and you're basically proving a negative, because they don't recall anything. So what would it be accomplished there, other than perhaps your opposing counsel might be saying that you had sandbagged them because you thought you were going to, they thought you were going to come out and say that these folks lied, but you didn't do that. You just reinforced what was said before, because they said they didn't recall, and you got language issues, and all that sort of thing. So perhaps you're kind of damned if you do, and you're damned if you don't, in that sense. Is that a fair portrayal of this? Yes, Your Honor. And just to add a little bit more context, I had to smile when, in his reply brief, the defense described how hostile it would be for them to have recalled these witnesses. And these are young, I think 20-something, poorly educated men from Bangladesh who were in a foreign court testifying in a foreign language, and they were not Colonel Nathan Jessup. These guys were very, were terrified to be in that courtroom. And so to say that he would have come across as, or his direct examination, questioning of them regarding what they had, the conversations that they had with their attorney, maybe he would have seemed like a bully, but that comes with the territory of being a defense counsel. And sometimes prosecution has to be in the position of being a bully if the goal is to get to the truth. So given that context, and again, going back to Judge Kuhnauer, who presided over the trial, he was able to observe these witnesses, these victims firsthand, their demeanor, and his conclusion at the end of the day, as was the conclusion of the jurors, was that their testimony, either the jury found that the explanation given by Tazizul, that they weren't paying attention during the TVISA discussion, or they had lied about that, they had been truthful about everything else, was sufficient to establish proprionorismal cause. Can I ask you about the closing argument that I guess it's your co-counsel who gave it? I guess I understand that Judge Kuhnauer ultimately wasn't troubled enough by what occurred in his presence, and despite his attempts to get your colleague back on track. But I have to say, I found it very troubling. It struck me as blatant and obvious misconduct, and it was on such a repeated basis to interject matters that were outside the record that I started to get the feel as though your colleague was doing this deliberately. I'd like to hear your response to why we shouldn't reverse the convictions on the basis of misconduct in closing argument alone. Your Honor, I would – three points. First of all, Judge Kuhnauer did, I think, a superb job of whenever my colleague started to go beyond the line, Judge Kuhnauer would cut him back and bring him back into line. Second, he would remind the jury that closing arguments are arguments only and should be viewed in that context. And the third point, Your Honor, is – and if I may ask you, were there any particular potential misconduct that raised alarms more than others? There were about five or six instances in which your colleague deliberately tried to interject matters that were outside the record. And that's just – you all must receive the same training that all AUSAs do. Everyone knows you can't do that. It's completely improper. There is no reason why a district judge should be put in the position of having to repeatedly sustain objections and then try to cut off the prosecutor who wants to continue, notwithstanding the fact that an objection has been sustained, to continue to blurt out matters that are not properly before the jury. That just strikes me as – that's why I said it was so blatant and so egregious and done on a repeated basis that I had to wonder, was this deliberate? Is this just someone who is willfully flouting the rules because they want to gain some advantage before the jury? I just found it deeply troubling. I gather nothing has happened to your colleague. Everyone in your office thinks that he did a great job in closing argument, and congratulations on the great win. I assume that's where things stand. That's my problem with having our court here just say, well, it was clearly improper, but none of this ultimately mattered. Come on. It was closing argument. The judge told the jury lawyers' arguments don't matter. Obviously, if we sort of give our stamp of approval to that, it's the signal is you guys can just keep doing it because nothing is going to happen, at least unless you – I don't know what more blatant misconduct you could commit than what I read in the transcript, but I'd just like to hear your thoughts. You haven't said that any of this was proper, but is that your office's position, that no misconduct was committed? I cannot speak into whether or not there have been any internal measures to address that. What I can speak to is that in terms of whether or not it was in the shoes of my co-worker, I would say that we did have discussions prior to his closing argument where he wanted to make a kind of larger political statement, and I cautioned him against that. That said, from my own personal point of view, and of course we're biased, we're the government, I don't think that anything that he said steps so far beyond the line that it would given the admonishments of the judge, and the judge was, I think, strict and conveyed that he was displeased with the direction that the closing argument was taking, and the jury read that and understood that. So at the end of the day, is that enough to overwhelm the evidence, all of the documents, all the testimony that was submitted after a three-week trial? I understand that you also have a job to do and a point to make and to ensure that prosecutors understand where the line is and not to cross that line, but I think that that can be done without disrupting what was otherwise a very fair trial. And I'll just make one last point. Judge Kuhnhauer really went to great lengths, and it was much to our frustration to provide the defense with a very, you know, in our set, in our view, extraordinary measures, including allowing a witness to testify via Skype from Bangladesh. That's something that the government would never be able to get away with, and yet the judge gave an instruction that they should treat that testimony as if it were in the courtroom itself, and so there was a little bit of frustration on our point. And I see that I'm out of time, but I can answer any other questions. Yeah. Okay, I think we're fine. Thank you very much. Thanks both for your argument. We appreciate it. This is a challenging case. The case just argued is submitted, and we'll have a decision for you soon.
judges: Graber, M. Smith, Watford